FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 AUG -5  PM 4: 20

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CONNIE CATCHINGS | * | CIVIL ACTION |
| VERSUS | * | NO. 01-2111 |
| ST. TAMMANY ASSOCIATION FOR RETARDED CITIZENS | * | SECTION "F" |
| | * | MAGISTRATE 2 |

\*     \*     \*     \*     \*     \*     \*     \*

## MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, comes defendant St. Tammany Association for Retarded Citizens who, pursuant to FRCP 56 moves this court for an order granting its Motion for Summary Judgment as there are no issues of material fact and defendant is entitled to judgment as a matter of law.

LEBLANC, TUSA & BUTLER, LLC

_____
MICHAEL T. TUSA, JR., #02154
2121 Airline Drive
Suite 405
Metairie, Louisiana 70001
(504) 828-1010 (phone)
(504) 828-1079 (fax)
Attorney for St. Tammany Association for
Retarded Citizens



## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been forwarded to all counsel of record via U.S. Mail, postage pre-paid and properly addressed, this 2nd day of August, 2002.

_____
MICHAEL T. TUSA, JR.

2

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CONNIE CATCHINGS** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 01-2111** |
| **ST. TAMMANY ASSOCIATION**<br>**FOR RETARDED CITIZENS** | * | **SECTION "F"** |
| | * | **MAGISTRATE 2** |

\*   \*   \*   \*   \*   \*   \*   \*

**STATEMENT OF UNCONTESTED FACTS**

NOW INTO COURT, through undersigned counsel, comes defendant St. Tammany Association for Retarded Citizens who files the following statement of uncontested facts:

1. St. Tammany Association for Retarded Citizens ("STARC") is a Louisiana not for profit corporation which provides a variety of services for developmentally disabled adults in the parish of St. Tammany;

2. STARC employs approximately 200 people and provides services to innumerable developmentally disabled adults;

3. Plaintiff was originally hired by STARC on June 24, 1997 as a job trainer (Exhibit 1, page 27);

4. As part of that process plaintiff was interviewed by Executive Director Dianne Baham and

was hired by Ms. Baham;

5.      As part of the pre-employment background check on plaintiff a criminal conviction for theft was found (Exhibit 2);

6.      Plaintiff provided defendant a written explanation of this offense, and despite it, plaintiff was hired (Exhibit 3);

7.      While employed by STARC as a job trainer plaintiff had frequent transportation problems (Exhibit 1, page 13, 30);

8.      Indeed plaintiff conceded that her supervisors, Maggie Seago and Sherri Johnston often drove her to and from work to accommodate her transportation needs (Exhibit 1, pages 14-15; See also Exhibit 4 pages 13, 18, 35);

9.      While plaintiff was a job trainer she received disciplinary action for taking the company van to her home (Exhibit 12, Exhibit 1, pages 39-40);

10.     Plaintiff acknowledged that she received this write up (Exhibit 1, pages 39-40);

11.     Plaintiff quit the employ of STARC due to her father being ill (Exhibit 1, page 32);

12.     When plaintiff sought to return to work at STARC she contacted Sherri Johnston (Exhibit 1, page 33);

13.     At the time of the initial contact Ms. Johnston advised plaintiff that there were no openings but she would contact plaintiff as soon as an opening became available (Exhibit 1, page 33);

14.     Ms. Johnston in fact contacted plaintiff when a substitute position came open (Exhibit 1,

2

page 33);

15.     Thereafter, on or about July 12, 1999, plaintiff reapplied for employment with STARC. She was interviewed by Ms. Baham again;

16.     This time she was hired, upon Ms. Johnston's recommendation as an Extra Board substitute (Exhibit 1, pages 33-34);

17.     Sometime thereafter, plaintiff's immediate supervisor Sherri Johnston recommended that she be promoted ( Exhibit 1, page 35; Exhibit 4, page 36);

18.     In connection with that recommendation plaintiff was promoted to the full time job of Direct Support Worker Instructor;

19.     Plaintiff's transportation problems continued after her rehire and her supervisors continued to accommodate her (Exhibit 1, page 30; Exhibit 4, pages 13, 35);

20.     The record reflects that Ms. Catchings was evaluated by her supervisor Sherri Johnston on or about September 25, 2000 (Exhibit 19);

21.     At that time Ms. Catchings received a "good" rating but the form reflects that she was counseled that: "She needs to continue to work on training her clients on contracts and to get her work finished in a timely manner" (Exhibit 19);

22.     As an Instructor plaintiff's job duties in part consisted of supervising client groups and assuring quality assurance in work contracts performed by client groups (Exhibit 1, pages 35-37);

23.     Her job duties included oversight of the developmentally disabled staff (direct support

3

workers) who performed such tasks as preparing fork, knife and napkins pre-rolled for certain restaurants (Exhibit 5; Exhibit 4, page 15, Exhibit 1, pages 35-37);

24. This was done in an assembly line fashion by disabled staff with oversight by instructors like plaintiff (Exhibit 4, page 15)  (see also Exhibit 5 - job description);

25. Some of the restaurants for whom STARC performed this work were O'Henry's, Creole's Kitchen, and Kathryn & Co. (Exhibit 1, pages 36, 54, 60);

26. The restaurant contracts with STARC for a set number of pre-rolled flatware and pays STARC by the piece;

27. In September 1999 plaintiff received a written warning (Exhibit 1, page 42; Exhibit 30);

28. In October 1999 plaintiff received a written warning (Exhibit 1, page 42; Exhibit 31);

29. In December 1999 plaintiff received a written warning (Exhibit 1, page 43, Exhibit 13);

30. In January 2000 plaintiff received a written warning and was placed on probation (Exhibit 1, pages 43-44; Exhibit 23);

31. In June 2000 plaintiff received several written warnings (Exhibit 1, pages 44-47; Exhibit 14; Exhibit 15; Exhibit 16);

32. On or about July 5, 2000 plaintiff received a memo from her supervisor concerning job performance problems (Exhibit 1, pages 47-48; Exhibit 32);

33. Due to errors in production by direct support staff in the counts, and the failure of instructors to catch the errors, O'Henry's cancelled its contract with STARC in January, 2001;

4

34.   As a direct result a memo was sent to all instructors, including Connie Catchings, on

      January 19, 2001, detailing the problem (Exhibit 20; Exhibit 1, page 59);

35.   The January 19, 2001 memo ends with this admonition:

> Elenora and I will be spot checking the contracts.  Any future
> occurrence of these issues could result in disciplinary actions.
> (Exhibit 20.)

36.   On February 2, 2001 there was a Quality Assurance meeting with all staff (Exhibit 21;

      Exhibit 1, pages 52-53);

37.   At that meeting staff, including Ms. Catchings, were told that there would be spot checks

      on flatware counts from now on (Exhibit 21);

38.   In fact the minutes to the Quality Assurance meeting reflect as follows:

> **Quality (<u>top quality</u>) is a must!**
> ◇      Client appearance
> ◇      Facility appearance
> ◇      Program atmosphere (adequate lighting, cleanliness, music
>          playing, coffee brewing)
> ◇      Contract work
>          Note: STARC just lost a contract that has been in place for
>          several years for one reason: <u>poor quality</u>.  Specifically, if
>          a staff member puts a label on a box and initials it,
>          signifying there is a certain number of items in the box,
>          then it gets to the customer; they count the merchandise;
>          the number of items in the box is different than the number
>          on the label . . . . then it is a problem.  Recently, just such
>          an incident occurred resulting in STARC losing a valuable
>          and meaningful work contract.  In turn, several adult men
>          and women who worked in that contract lost their jobs and
>          lost wages.  **This can never happen again.  Spot checks
>          will be made often by supervisors to ensure quality in
>          all areas of service expected by STARC staff members.**
>          (Exhibit 21.)

39.   Plaintiff was aware of the loss of the O'Henry contract and was aware instructors needed to be sure the flatware count was accurate (Exhibit 1, pages 55-56);

40.   As Ms. Johnston testified, after the loss of the O'Henry contract and the meetings on the issues, there was no way that instructors like plaintiff did not understand the importance of the count being accurate (Exhibit 4, page 31);

41.   Despite these warnings, on or about February 5, 2001 a count of certain boxes packed for shipment to Kathryn & Company and another to Creole's restaurant revealed more errors by Ms. Catchings (Exhibit 6);

42.   These errors were caught by Ms. Elenora Crawford (Exhibit 6);

43.   Plaintiff concurred that there were errors in the count (Exhibit 1, pages 56-57, Exhibit 6);

44.   As a result Ms. Crawford (BF) and Ms. Johnston (WF) jointly recommended plaintiff's termination (Exhibits 6, Exhibit 4, page 37);

45.   Ms. Catchings conceded these errors and was terminated on or about February 7, 2001 (Exhibit 1, pages 56-57, Exhibit 22);

46.   Similar problems were identified at the same time with other instructors who were also fired (Exhibit 4, page 37, Exhibit 6);

47.   The other instructors who were fired for the same reason were: Michele Cryer and Taneka Collins (Exhibit 4, page 37; Exhibit 6);

48.   Thereafter, STARC eventually filled Ms. Catchings position by hiring Beth Cavalier (BF) (Exhibit 4, page 37, Exhibit 6);

49.   Ms. Johnston recommended Ms. Cavalier and Ms. Baham hired her to replace Ms.

6

Catchings (Exhibit 4, page 537-38);

**LEBLANC, TUSA & BUTLER, LLC**

MICHAEL T. TUSA, JR., #02154
2121 Airline Drive
Suite 405
Metairie, Louisiana  70001
(504) 828-1010 (phone)
(504) 828-1079 (fax)
Attorney for St. Tammany Association for
Retarded Citizens

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been forwarded to all counsel of record via U.S. Mail, postage pre-paid and properly addressed, this 2nd day of _August_, 2002.

MICHAEL T. TUSA, JR.

7

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CONNIE CATCHINGS** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 01-2111** |
| **ST. TAMMANY ASSOCIATION** | * | **SECTION "F"** |
| **FOR RETARDED CITIZENS** | | |
| | * | **MAGISTRATE 2** |

*     *     *     *     *     *     *     *

## <u>NOTICE OF HEARING</u>

**PLEASE TAKE NOTICE** that the hearing on defendant's Motion for Summary Judgment will be set before the Honorable Judge Joseph C. Wilkinson, Jr. on August 21, 2002 at 11:00 o'clock a.m.

**LEBLANC, TUSA & BUTLER, LLC**

_____

MICHAEL T. TUSA, JR., #02154
2121 Airline Drive
Suite 405
Metairie, Louisiana  70001
(504) 828-1010 (phone)
(504) 828-1079 (fax)
Attorney for St. Tammany Association for Retarded Citizens

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been forwarded to all counsel of record via U.S. Mail, postage pre-paid and properly addressed, this 2nd day of August, 2002.

_____

MICHAEL T. NUSA, JR.

S:\mtusa\2862-005 (01-2111)\PLEADINGS\NOTICE OF HEARING-MSJ.wpd

2

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CONNIE CATCHINGS** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 01-2111** |
| **ST. TAMMANY ASSOCIATION** | * | **SECTION "F"** |
| **FOR RETARDED CITIZENS** | | |
| | * | **MAGISTRATE 2** |

\*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

  This memorandum is submitted on behalf of defendant St. Tammany Association for

Retarded Citizens ("STARC") and in support of its Motion for Summary Judgment.  In particular

STARC moves this court for an order dismissing all of plaintiff's claims for the reasons set forth

herein.

  In pertinent part, FRCP 56(b) provides that:

> a party against whom a claim, counterclaim, or cross claim is
> asserted . . . may, at any time, move, with or without supporting
> affidavits for a summary judgment in the party's favor as to all or
> any part thereof.

FRCP 56(c) also sets forth the relevant standard for determining whether summary judgment

should be granted.  Specifically, it provides that:

> . . .The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories and admissions
> on file, together with the affidavits, if any, show that there is no
> genuine issue as to any material fact and that the moving party is
> entitled to judgment as a matter of law.

See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202

(1986).

 In Celotex Corp. v. Catrett, *supra*, the court noted that:

> The plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion,
> against a party who fails to make a showing sufficient to establish
> the existence of an element essential to that party's case, and on
> which that party will bear the burden of proof at trial.

See also Hans Const. Co. v. Phoenix Assur. Co. of New York, 995 F.2d 53 (5th Cir. 1993); George

v. Kramo Ltd., 796 F.Supp. 1541, 1545 (E.D. La. 1992); Etheridge v. Sub Sea International, 806

F.Supp. 598, 600 (E.D. La. 1992).

 It has been repeatedly affirmed that a Motion for Summary Judgment is appropriate in

employment discrimination litigation.[1] See Chock v. Northwest Airlines, Inc., 113 F.3d 861 (8th

Cir. 1997); Evans v. Technologies Applications and Service Company, 80 F.3d 954 (4th Cir.

1996); Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1312 (8th Cir. 1995); Shannon v. Ford Motor

---

[1] This remains true even after Reeves v. Sanderson Plumbing, 120 S.Ct. 2097
(2000).   See Auguster v. Vermillion Parish School Board, 249 F.3d 400 (5th Cir. 2001);
Rubinstein v. Administrators of the Tulane Educational Fund, 218 F.3d (5th Cir. 2000).

2

Co., 72 F.3d 678 (8th Cir. 1996); Barrow v. New Orleans Steamship Association, 10 F.3d 292

(5th Cir. 1994); Bodenheimer v. P.P.G. Industries, Inc., 5 F.3d 955 (5th Cir. 1993); Journigan v.

Eastover Bank for Savings, 805 F.Supp. 415 (S.D. Miss. 1992); Aleman v. State of Texas, 803

F.Supp. 10 (S.D. Tex. 1992); Johnson v. Southwestern Bell Telephone, 819 F.Supp. 578 (E.D.

Tex. 1993); Moore v Eli Lilly & Co., 802 F.Supp. 1468 (N.D. Tex. 1992). This has also been true

in claims, like plaintiff's herein.

**A.    What constitutes "proof" by the plaintiff in response to a Motion for Summary
Judgment?**

In responding to a Motion for Summary Judgment, not just any evidence presented by a

plaintiff constitutes sufficient evidence to defeat a Motion for Summary Judgment. As the court

wrote in Etheridge, supra, 600:

> The mere argued existence of a factual dispute does not defeat an
> otherwise properly supported motion. Therefore, 'if the evidence
> is merely colorable, or is not significantly probative,' summary
> judgment is appropriate. [Anderson] 477 U.S. at 249-50 . . . .

See also Schenck v. Living Centers East, 917 F.Supp. 432 (E.D. La. 1996); Sinkler v. Midwest

Property Management, 209 F.3d 678 (7th Cir. 2000). In other words, in responding to a Motion

for Summary Judgment, not just any evidence will be sufficient to defeat it.[2]  See Douglas v.

United Services Auto Ass'n., 79 F.3d 1415, 1429 (5th Cir. 1996).

More importantly, the court in Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 993 (5th Cir.

---

[2]      As the court recently wrote in Rubinstein, supra, ". . . discrimination suits still
require evidence of discrimination." 218 F.3d at 400.

3

1996) noted that in assessing summary judgment evidence, "There must be a conflict in substantial evidence to create a jury question." In LaPierre v. Benson Nissan, Inc., 86 F.3d 444 (5th Cir. 1996), the court cited Rhodes, supra, and indicated that:

> In the employment discrimination context, evidence is 'substantial' if it is such as to allow a rational fact finder to make a reasonable inference that [disability] was a determinative reason for the employment decision. Page 449.

See also Walton v. Bisco Industries, 119 F.3d 368 (5th Cir. 1997). The court in LaPierre, supra, then created a two pronged test regarding summary judgment evidence and concluded that:

> A jury issue will be presented and a plaintiff can avoid summary judgment . . . if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [sex, race, etc.] was a determinative factor in the actions of which plaintiff complains. Page 450.

See also Ontiveros v. Asarco, Inc., 83 F.3d 732, 734 (5th Cir. 1996).

In applying this two-pronged standard to plaintiff's evidence in opposition to a Motion for Summary Judgment it is important to note what is not considered by the courts as sufficient or "substantial" enough evidence to defeat a Motion for Summary Judgment. In Mosley v. Houston Community College System, 951 F.Supp. 1279, 1288-1289 (S.D. Tex. 1996), for example, the court wrote:

> Conclusory allegations and unsubstantiated assertions of racial discrimination are not sufficient to create a genuine issue of material fact and defeat summary judgment.

See also Douglas v. United Servs. Auto. Ass'n., 65 F.3d 452, 459 (5th Cir. 1995); Little v. Liquid

4

Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1995); Ray v. Tandem Computers, Inc., 63 F.3d 429, 434

(5th Cir. 1995).  Similarly, the court in Hernandez v. Exxon Corp., 943 F.Supp. 740, 746-747

(S.D. Tex. 1996) wrote:

> An employee's own subjective belief of discrimination, however
> genuine, cannot serve as the basis for judicial relief.

In Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960 (4th Cir. 1996),

the court went one step further in assessing the plaintiff's summary judgment evidence.  In

particular, the court noted that:

> . . . (Plaintiff's own opinions and conclusory allegations do not
> have sufficient probative force to reflect a genuine issue of
> material fact.)

See also Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 245 (4th Cir. 1982).  Further,

"...inadmissable hearsay cannot defeat a Motion for Summary Judgment . . . ."  Pritchard v.

Southern Co. Services, 92 F.3d 1130, 1135 (11th Cir. 1996).[3]

In the present case, there are no material factual issues in dispute of significance.  Indeed,

this motion is largely based on the position that as a matter of law, and based upon plaintiff's own

testimony, plaintiff cannot succeed on her claims.

---

[3]        These cases are particularly relevant to plaintiff's case herein as much of plaintiff's
"evidence" is her own opinion.  Indeed although plaintiff identified witnesses, in interrogatory
answers, whom plaintiff claimed would support her claim she was unable, in her deposition, to
cite a single fact known to these witnesses which supported her claims. (Exhibit 1, pages 97-98).

5

I.     **FACTUAL BACKGROUND**

St. Tammany Association for Retarded Citizens ("STARC") is a Louisiana not for profit corporation which provides a variety of services for developmentally disabled adults in the parish of St. Tammany.   STARC employs approximately 200 people and provides services to innumerable developmentally disabled adults in the community.

Plaintiff was originally hired by STARC on June 24, 1997 as a job trainer. (Exhibit 1, page 27.) As part of that process plaintiff was interviewed by Executive Director Dianne Baham and was hired by Ms. Baham.   As part of the pre-employment background check on plaintiff a criminal conviction for theft was found.  (Exhibit 2.)  Plaintiff provided defendant a written explanation of this offense, and despite it, plaintiff was hired.[4]  (Exhibit 3.)

While employed by STARC as a job trainer plaintiff had frequent transportation problems. (Exhibit 1, pages 13, 30.) Indeed plaintiff conceded that her supervisors, Maggie Seago and Sherri Johnston, along with other employees, often drove her to and from work to accommodate her transportation needs.  (Exhibit 1, pages 14-15; See also Exhibit 4 pages 13, 18, 35.)   While plaintiff was a job trainer she received disciplinary action for taking the company van to her home. (Exhibit 12.) Plaintiff acknowledged that she received this write up. (Exhibit 1, pages 39-40.)  She was also seen driving the company van off her route on personal business and was

---

[4]      At the time of plaintiff's deposition it appears there was a warrant out for her arrest for issuing worthless checks. (Exhibit 10.) Plaintiff claimed to be unfamiliar with the warrant but conceded her middle initial is "N" and she resides at the address listed on North 3rd Street. (Exhibit 1, pages 15-16.)  Interestingly the notice of this warrant appeared two (2) months after Ms. Catchings was asked by STARC to cease borrowing money from petty cash. (Exhibit 11.)

6

disciplined for this violation.  (Exhibit 1, page 42.)

Plaintiff quit the employ of STARC due to her father being ill.[5]  (Exhibit 1, page 32.)

At some point, after her father's death, plaintiff became desirous of returning to work at STARC.  Plaintiff contacted Sherri Johnston and inquired about any openings.  (Exhibit 1, page 33.)  Ms. Johnston advised plaintiff at the time that there were no job openings but she would contact plaintiff if anything came open.  (Exhibit 1, page 33.)  Ms. Johnston ultimately contacted plaintiff when a substitute position became open.  (Exhibit 1, page 33.)

Thereafter, on or about July 12, 1999, plaintiff reapplied for employment with STARC. She was interviewed by Ms. Baham again.  This time she was hired, upon Ms. Johnston's recommendation, for the job position of Extra Board substitute.  (Exhibit 1, pages 33-34.)  As the name implies this was a substitute position filling in on an as needed basis.

Plaintiff's immediate supervisor Sherri Johnston then recommended that she be promoted.  (Exhibit 4, page 36; Exhibit 1, page 35.)  In connection with that recommendation plaintiff was promoted to the full time job of Direct Support Worker Instructor.  Plaintiff's transportation problems continued after her rehire and her supervisors continued to accommodate her.  (Exhibit 1, page 30; Exhibit 4, pages 13, 35.)

As an Instructor plaintiff's job duties in part consisted of supervising client groups and assuring quality assurance in work contracts performed by client groups.  (Exhibit 1, pages 35-

---

[5]    Sherri Johnston, plaintiff's supervisor, recalled this as a difficult time for Ms. Catchings noting: "I prayed with her many times when her father died" (Exhibit 4, page 18.)

7

38.)  These duties included oversight of the developmentally disabled staff (direct support workers) who performed such tasks as preparing fork, knife and napkins pre-rolled for certain restaurant. This was done in an assembly line fashion with oversight by instructors like plaintiff. (Exhibit 4, page 15; See also Exhibit 5 - job description.)

As Ms. Catchings herself noted, part of her duties, as to these contracts was:

> After they finished, then I have to make sure that everything was in order, that the contract was exactly as it was called as it had to be.  (Exhibit 1, page 37.)

Some of the restaurants for whom this work was performed were O'Henry's, Creole's Kitchen, and Kathryn & Co.  (Exhibit 1, pages 36, 54, 60.)  The restaurant contracts for a set number of pre-rolled flatware and pays by the piece.[6]  Ms. Catchings was responsible for assuring the count was correct.  (Exhibit 1, pages 37-38.)

Ms. Catchings continued to have disciplinary problems after her re-employment.  She was written up in September and October of 1999.  (Exhibits 29, 20; Exhibit 1, pages 42-43.)  On or about December 16, 1999 she was written up and placed on 30 day probation for taking time off without approval.  (Exhibit 13.)  On January 12, 2000 she was written up again and her probation was continued for another thirty days.  (Exhibit 23; Exhibit 1, pages 43-44.)  At that point Ms. Johnston spoke to plaintiff and she understood that future mistakes could lead to termination. (Exhibit 1, page 44.)  Thereafter on June 15, 2000 Ms. Catchings was written up for violation of

---

[6]     The clients also perform other types of tasks under other contracts, like assembling fishing lures.  (Exhibit 1, page 36.)

policy concerning requesting leave time. (Exhibit 14.) On June 28, 2000 Ms. Catchings was written up for failure to turn in payroll information on a client (Exhibit 15) and having collect calls charged to STARC in violation of policy. (Exhibit 16; Exhibit 1, pages 44-47.) These repeated offenses prompted Sherri Johnston to recommend Ms. Catchings' termination. (Exhibit 17.) However, after discussion with the Executive Director, Dianne Baham, Ms. Catchings was given another chance.

On September 26, 2000 Ms. Catchings was warned about being absent from work. (Exhibit 18.) The record reflects that Ms. Catchings was evaluated by her supervisor Sherri Johnston on September 25, 2000. (Exhibit 19.) At that time, despite her disciplinary record, Ms. Catchings received a "good" rating but the form reflects that she was counseled that: "She needs to continue to work on training her clients on contracts and to get her work finished in a timely manner".[7] (Exhibit 19.)

Due to errors in production by direct support staff in the flatware counts O'Henry's cancelled its contract with STARC in January, 2001. As a direct result a memo was sent to all instructors, including Connie Catchings, on January 19, 2001, detailing the problem. (Exhibit 20; Exhibit 1, page 59.) Ms. Catchings concedes she received this memo. (Exhibit 1, page 59.) The memo ends with this admonition:

> Elenora and I will be spot checking the contracts. Any future occurrence of these issues could result in disciplinary actions.

---

[7]      The "contracts" referred to in this evaluation are the flatware contracts ultimately involved in plaintiff's termination. (Exhibit 4, page 29.)

9

(Exhibit 20.)

On February 2, 2001 there was a Quality Assurance meeting with all staff. (Exhibit 21; Exhibit 1, pages 52-53.) At that meeting staff, including Ms. Catchings, were told that there would be spot checks on counts from now on. (Exhibit 21.) In fact the minutes reflect as follows:

> **Quality (top quality) is a must!**
> ◊     Client appearance
> ◊     Facility appearance
> ◊     Program atmosphere (adequate lighting, cleanliness, music playing, coffee brewing)
> ◊     Contract work
> Note: STARC just lost a contract that has been in place for several years for one reason: poor quality. Specifically, if a staff member puts a label on a box and initials it, signifying there is a certain number of items in the box, then it gets to the customer; they count the merchandise; the number of items in the box is different than the number on the label . . . . then it is a problem. Recently, just such an incident occurred resulting in STARC losing a valuable and meaningful work contract. In turn, several adult men and women who worked in that contract lost their jobs and lost wages. **This can never happen again. Spot checks will be made often by supervisors to ensure quality in all areas of service expected by STARC staff members.** (Exhibit 21.)

As Ms. Johnston testified, after the loss of the O'Henry contract and the meetings on the issues, there was no way that instructors like plaintiff did not understand the importance of the count being accurate. (Exhibit 4, page 31.) Ms. Catchings herself concedes that she was aware of the loss of the O'Henry contract and was aware instructors needed to be sure the flatware count was accurate. (Exhibit 1, pages 55-56.)

10

Despite these warnings, on or about February 5, 2001 a count of certain boxes packed for shipment to Kathryn & Company and another to Creole's revealed more errors by Ms. Catchings. (Exhibit 6.)  These errors were caught by Ms. Elenora Crawford.  Plaintiff concurred that there were errors in the count.  (Exhibit 1, pages 56-57, 72, Exhibit 6.)  As a result Ms. Crawford (BF) and Ms. Johnston (WF) jointly recommended plaintiff's termination.[8]  (Exhibits 6, Exhibit 4, page 37.)  She was written up and terminated that day.  (Exhibit 22, Exhibit 28.)

Similar problems were identified at the same time with other instructors who were also fired.  The other instructors who were fired were: Michele Cryer and Taneka Collins.[9]  (Exhibit 4, page 37; Exhibit 6; Exhibit 26, Exhibit 27.)

Thereafter, STARC eventually filled Ms. Catchings position by hiring Beth Cavalier (BF).[10]  (Exhibit 4, page 37, Exhibit 6.)  Ms. Johnston recommended Ms. Cavalier and Ms. Baham hired her.  (Exhibit 4, page 537-38.)

## II.    PROCEDURAL BACKGROUND

On or about March 5, 2001 Ms. Catchings filed an EEOC charge against defendant STARC.  (Exhibit 8.)  In her EEOC charge she alleged that she was terminated from her

---

[8]    Plaintiff was unaware that Ms. Crawford also recommended her termination. (Exhibit 1, page 79.)

[9]    Plaintiff was aware that Takenya Collins was terminated for the same offense. (Exhibit 1, page 63.)

[10]    Plaintiff was unaware of who was hired to replace her.  (Exhibit 1, page 67.)

11

employment because of her race.  She indicated in the charge that the earliest/latest date of discrimination was February 7, 2001, the date of her termination.  (Exhibit 1, page 26.)  The EEOC issued a determination letter finding no basis for Ms. Catchings claim.  (Exhibit 9.)

Thereafter, Ms. Catchings apparently filed her EEOC charge with the District Court in July 2001.  (Exhibit 1, pages 77-78.)  It received a miscellaneous designation and was never served.  Ms. Catchings then filed a Motion to Appoint an attorney which was denied because she failed to appear at the hearing.  (Exhibit 29.)  Thereafter, on a Motion to Reconsider the court appointed the Tulane Law Clinic as her counsel on or about January 7, 2002.  (Exhibit 33.)

It was only in February, 2002 when Ms. Catchings's daughters suit was taken over by the Tulane Law Clinic that defendant learned of the lawsuit by Connie Catchings.  An amended lawsuit was filed on Ms. Catchings' behalf by Tulane asserting various claims.

Thereafter, defendant filed a Motion to Dismiss certain state law claims asserted by plaintiff pursuant to FRCP 12(b)(6).  Plaintiff's counsel agreed and voluntarily dismissed these claims.  The only claims remaining are plaintiff's race discrimination claim and her claim of alleged retaliation for engaging in some sort of protected activity.

## III.  PLAINTIFF'S BURDEN OF PROOF: RACE DISCRIMINATION CLAIM

### A.  Plaintiff must prove a prima facie case of race discrimination

In the context of a race discrimination claim, there is a specific allocation of proof.[11]  See

---

[11]     The same analysis is appropriate under La. R.S. 23:332.  See Trahan v. Rally's Hamburgers, Inc., 696 So.2d 637 (La. App. 1st Cir. 1997).

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Texas

Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981);

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993).

This allocation of proof applies regardless of whether plaintiff's claim is a failure to hire, failure

to promote, or a wrongful termination claim on the basis of race.

 The allocation of proof requires that plaintiff first establish a prima facie case of race

discrimination. See James v. Ranch Mart Hardware, Inc., 881 F.Supp 478 (D. Kan. 1995); Evans

v. Jay Instrument and Specialty Co., 889 F.Supp 802 (S.D. Ohio 1995). To establish a prima facie

case of race discrimination, Ms. Catchings must prove that: (1) she is a member of a protected

class; (2) she was qualified for the job in question; (3) she suffered an adverse employment action;

and (4) non-class members (in this case, white employees) in the same or similar circumstances

were treated more favorably. See James, *supra*, Dean v. Pepsi Cola Binghamton Bottlers, 894

F. Supp. 600 (N.D.N.Y. 1995).

 In the present case, it is undisputed that plaintiff is African American and, therefore, in

a protected class. Similarly, it is not disputed that at the time of her employment separation

plaintiff was qualified for her job. It is also undisputed that she suffered an adverse employment

action by being terminated. However, defendant does dispute whether plaintiff can carry her

burden of proving the final element of her prima facie case.

 **B.**  **Plaintiff cannot prove that white employees were treated more favorably**

 The final element of her prima facie proof is that similarly situated white employees were

13

treated more favorable than she was treated.   Plaintiff has no proof on this point as there is none.

### C.    Defendant's burden of production

Assuming *arguendo* that the plaintiff proves a prima facie case of discrimination, which is denied, the burden of production then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions.   LaPierre, *supra*.   This burden of production on defendant to articulate a legitimate nondiscriminatory reason for its actions is not very great.   As the court noted in Hartsel v. Keys, 87 F.3d 795, 800 (6th Cir. 1996):

> It is important to note that the defendant need not prove a non-discriminatory reason . . . but need merely articulate a valid rationale.

The courts have also made it clear that the law does not allow the courts to second guess the employee's articulated reasons for its actions.   As the court noted in Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1312 (8th Cir. 1995):

> Deere proffered a legitimate nondiscriminatory reason for giving Bundschuh the position.   We do not sit to determine if this reason is based on sound principles of business judgment.   Davenport v. Riverview Gardens School, 30 F.3d 940, 945 (8th Cir. 1994).   Nor is it our place to tell a business that it must promote an individual who may very well be inappropriate for a position. . .

Rather, the relevant inquiry is whether the employer's decision was based on race.

After the defendant articulates a legitimate nondiscriminatory reason for its action, the plaintiff bears "...the final burden of persuasion on the issue of intentional discrimination."   See Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1130 (4th Cir. 1995); Bodenheimer v. P.P.G. Industries, 5 F.3d 955, 957 (5th Cir. 1993).   In other words, the plaintiff must carry the

14

burden of proof on "the ultimate question of whether the defendant intentionally discriminated against plaintiff." LaPierre, *supra*, page 446. The mere fact that a plaintiff even succeeds at proving that a defendant's proffered reasons for its actions are pretextual does not necessarily mean plaintiff is entitled to judgment because the ultimate issue on which plaintiff bears the burden of persuasion is not whether the employer has given the true reasons for its actions but whether the employer's actual reason is a discriminatory one prohibited by law. See St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993); Rhodes v. Guiberson Oil Tools, 75 F.3d 989 (5th Cir. 1996).

> **D.** **Defendant has articulated a legitimate non-discriminatory reason for its actions in terminating plaintiff**

As previously noted, if plaintiff succeeds at proving a prima facie case of race discrimination, the employer must articulate a legitimate non-discriminatory reason for its actions. See Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089-1090 (5th Cir. 1995). In the present case defendant has presented an overwhelming amount of evidence setting forth a legitimate nondiscriminatory reason for its actions. It is undisputed that prior to plaintiff's termination she had a history of disciplinary action. (Exhibits 12, 13, 14, 15, 16, 17, 18, 23, 29, 30, 31.) This disciplinary action was so significant that as of January, 2000 plaintiff was put on disciplinary probation and admonished that "any subsequent violations will result in termination" (Exhibit 23.) Ms. Catchings concedes that as of January 2000 Ms. Johnston met with her and discussed her job related problems. (Exhibit 1, page 44.) Ms. Catchings understood at that time that future mistakes might result in her termination. (Exhibit 1, page 44.)

15

Thereafter, in January, 2001 the instructors, like plaintiff, who performed work on STARC restaurant contracts made errors in the work they did on those contracts. The errors were significant enough that one of the restaurants, O'Henry's, cancelled its contract with STARC. The clients involved in this and similar contracts were those supervised by plaintiff and her co-workers, Michele Cryer and Taneka Collins.

Defendant responded to this problem with a memo to all instructors including plaintiff detailing the problem (Exhibit 20). That memo advises that there will be future spot checks of the work and "any future occurrence of these issues could result in disciplinary actions". (Exhibit 20.) Plaintiff was aware of the cancellation of the O'Henry contract and of the memo from STARC to instructors, like her, advising of possible future spot checks. (Exhibit 1, pages 55-56; Exhibit 4, page 31.) Plaintiff was also aware that she and other instructors needed to be sure the flatware count was correct. (Exhibit 1, pages 55-56.)

Subsequent to the January 19, 2002 memo a Quality Assurance meeting was held on February 2, 2001. (Exhibit 21; Exhibit 1, pages 52-53.) Plaintiff was in attendance at this meeting and the loss of the O'Henry contract was discussed. (Exhibit 21.)

Despite these admonitions more errors were found in plaintiff's work on or about February 5, 2001. The errors in count, for two of the STARC flatware contracts, were caught by Elenora Crawford (BF). (Exhibit 6.) Ms. Catchings conceded that these errors were in fact caught and she was present during the count. (Exhibit 1, pages 56-57.)

As a result, Ms. Sherri Johnston (WF) and Ms. Elenora Crawford (BF) recommended Ms.

16

Catchings termination. (Exhibit 6, Exhibit 4, page 37.) Ms. Dianne Baham (WF) made the decision to terminate Plaintiff's employment based upon these recommendations. (Exhibit 7) As Ms. Johnston stated in her deposition:

> Ms. Catchings was terminated because of the fact that we had a contract that we lost because of poor quality control. We called in all the staff that were dealing with the flatware contracts and explained to them about that. We did a spot check on all of the existing contracts we still had. there were some error there. We told them that they needed to go back over the remaining boxes that were still in the building that had not been shipped to the other companies to ensure that the quality was there and that we would be rechecking them. And they were rechecked. And there were - - we told them at the time that we could not afford for this to continue to happen because this is work for our individuals. And quality control lost us the other one. And if this happened - - continued to happen, we could lose more work for our clients. And that if it did, then it would result in the termination. We explained that. And when we rechecked it the last time, the ones that had errors were recommended to be terminated. (Exhibit 4, pages 11-12.)

Ms. Catchings was not the only instructor terminated. In fact both of her co-workers Michele Cryer and Taneka Collins were terminated. (Exhibit 4, page 37; Exhibits 6, 7.) All three employees were terminated at the same time for the same reason. (Exhibits 25, 26, 27, 28.) This recitation of facts makes it clear that defendant has articulated a legitimate non-discriminatory reasons for its actions.

**E.    Plaintiff has no proof of pretext or discrimination as to her race discrimination claim**

After the defendant has articulated a legitimate non-discriminatory reason for its actions, the burden shifts to the plaintiff to prove pretext and intentional discrimination. In <u>Bodenheimer</u>

17

v. PPG Industries, 5 F.3d 955 (5th Cir. 1993), the court wrote:

> To prevail ultimately, the plaintiff must prove, through a preponderance of the evidence, that the employer's reasons were not the true reasons for the employment decision and that her unlawful discrimination was. Bodenheimer, *supra*, page 957.

See also Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1130 (4th Cir. 1995).

In the present case, plaintiff clearly "believes" that she was discriminated against by defendant. However, such a belief is insufficient to carry her burden of proof. Plaintiff's dilemma is that her own testimony establishes that there was no pretext and that her race was not a factor in the decisions of which she complains.

### 1.    Defendant had twice hired plaintiff which reflects no racial animus, indeed Sherri Johnston recommended plaintiff for rehire.

The evidence reflects that plaintiff has been hired by defendant on two separate occasions. (Exhibit 1, page 27.)    Plaintiff left STARC of her own volition at some point to care for her ill father. (Exhibit 1, page 32.) When she sought to return to STARC she contacted Sherri Johnston. (Exhibit 1, page 33.)  Ms. Johnston told her there were no positions available at the time but would contact her as soon as there was an opening. (Exhibit 1, page 33.) Ms. Johnston[12] in fact notified her when a substitute position came open. (Exhibit 1, pages 33-34.)  In addition it was Ms. Sherri Johnston who recommended that plaintiff be promoted from the substitute list to permanent instructor. (Exhibit 4, page 36.)  Needless to say at the time of both hires and at the

---

[12]    Plaintiff claims herein that Ms. Johnston and Ms. Baham discriminated against her. (Exhibit 1, page 78.)

18

time of her promotion plaintiff was an African-American. Her race was not a factor in her hirings or in her promotion and, therefore, these facts strongly suggest it was of no relevance to her termination.

**2.    Plaintiff's termination was recommended jointly by Sherri Johnston (WF) and Elenora Crawford (BF).**

The incidents concerning the miscount of flatware and the loss of the O'Henry contract were significant to defendant. As noted it resulted in a memorandum being issued to all staff and a Quality Assurance meeting being held to discuss the subject. (Exhibits 20, 21.) Plaintiff concedes that she was fully aware of the problem and the need for better quality control. (Exhibit 1, pages 55-56.)

Despite these clear warnings of the significance of getting the flatware count correct, plaintiff, within days of the Quality Assurance meeting, had count errors in two boxes of flatware for two different restaurant customers of STARC. The error in count was confirmed by plaintiff's immediate supervisor Elenora Crawford (BF). (Exhibit 6; Exhibit 1, pages 56-57.) As a result of these errors Sherri Johnston (WF) and Elenora Crawford (BF) both recommended plaintiff's termination. (Exhibit 4, page 37; Exhibit 6.) Plaintiff was not aware that Ms. Crawford, an African American female, jointly recommended her termination. (Exhibit 1, page 78.) The fact that an African American female, Ms. Crawford, also recommended plaintiff's termination, based upon these facts, is further dispositive proof that race was not a factor in plaintiff's termination. If another African American female felt this was a sufficient basis for termination it is clear that plaintiff's race was not a factor in the decision to terminate her. It is another factor which defeats

19

plaintiff's ability to prove race discrimination or pretext.

### 3. Defendant's personnel routinely assisted plaintiff to allow her to get to and from work again reflecting no racial animus.

It is undisputed that defendant and its staff routinely tried to help plaintiff so she could perform her job. The following colloquy on this occurred with Ms. Johnston:

> Q.   You mentioned earlier that there was a period of time when you and another lady gave her rides to and from work. How long did that go on for?
>
> A.   Gosh, a minimum of a month or more.
>
> Q.   You also - - I think you - -?
>
> A.   In fact, just I didn't interject that. Just also share that the other individual paid for the engine to be put in the car. She bought her the engine to be put in her car, you know, trying to help. (Exhibit 4, page 35.)

At another point in the deposition Ms. Johnston stated: "And, therefore, I and her other supervisor transported her back and forth to work for many, many months so that she could keep her job" (Exhibit 4, page 18.) Ms. Catchings did not dispute these facts. She conceded that Sherri Johnston, Maggie Seago and Gwen Flemings brought her to and from work for months. (Exhibit 1, pages 13-15.) Ms. Seago even lent her $250 (which she never repayed) to get her car fixed. (Exhibit 1, page 30.)

Do these actions sound like those of a company that discriminated against plaintiff because of her race? Ms. Johnston recommended plaintiff for hire and promotion and also acted as a friend to assure plaintiff could get to and from work. All of this reflects that plaintiff has no

20

proof of racial discrimination or pretext as to defendant.

### 4.    Plaintiff was replaced by another black female.

Plaintiff testified that she was unaware of whom defendant hired to replace her.  (Exhibit 1, page 67.)  In contrast Sherri Johnston testified that a lady named Beth Cavalier was hired to replace plaintiff.  (Exhibit 4, page 37.)  Ms. Elenora Crawford confirmed that Ms. Cavalier was hired to replace Ms. Catchings.  (Exhibit 6.)  In fact Sherri Johnston recommended Ms. Cavalier for hire after interviewing her.  (Exhibit 4, pages 537-38.)  Ms. Cavalier is an African American female like plaintiff.  (Exhibit 4, page 37; Exhibit 6.)  Consequently plaintiff was replaced by an African American female.  This is further dispositive evidence that plaintiff was not discriminated against by defendant because of her race.

### 5.    Plaintiff has no witnesses to support her claim.

Defendant propounded interrogatories to plaintiff to determine if plaintiff had any witnesses to support her claim of race discrimination.  In particular interrogatory No. 1 asked plaintiff to:

> Please state the name and address of each person you claim has information supporting your claim that STARC discriminated against you because of your race.  (Exhibit 24.)

Plaintiff answered this interrogatory by identifying 9 people: Parlotta Ducre, Genevia Craft, Valerie Piediscalza, Alta Mae Kirsh, Charlotte Fomich, Ceola Flemings, Gwen Flemmings, Sherri Johnston and Dianne Baham.  (Exhibit 24, plaintiff's answers to interrogatories.)  However, in her deposition plaintiff was asked what information each of these individuals had that supported

21

her race discrimination claim. She could not think of anything. (Exhibit 1, pages 97-98.)

As to Dianne Baham her affidavit is attached specifically refuting plaintiff's claims. As to Sherri Johnston her deposition makes it clear there are no facts supporting plaintiff's race discrimination claim. (Exhibit 4, page 35.) In addition the affidavit of Elenora Crawford is also attached. (Exhibit 6.) She is also not aware of any facts supporting plaintiff's claim of race discrimination. As a result plaintiff has identified no witnesses which support her claim of race discrimination and the claim should be dismissed.

**6.    So what does plaintiff complain constituted race discrimination?**

Plaintiff testified that Sherri Johnston and Dianne Baham discriminated against her because of her race. (Exhibit 1, page 78.) As to Ms. Johnston she says the fact that she was written up at any time proves race discrimination. (Exhibit 1, page 79.) As to Ms. Baham it is because "she lied"; and because of her facial gestures and tone. (Exhibit 1, pages 79, 82.) Plaintiff claimed she could tell by Ms Baham's "fake smiles" that this was indicative of racial discrimination. (Exhibit 1, page 85.) Although she felt Ms. Baham's tone was discriminatory she could not cite any examples. (Exhibit 1, pages 85-86.)

As to the alleged "lies" of Ms. Baham, this supposedly related to Ms. Baham not getting back to her on some disciplinary matters. (Exhibit 1, page 80.) But she then conceded Ms. Baham did get back to her, in writing no less. (Exhibit 1, page 83.) But she believes Ms. Baham made a "mistake" in the letter. (Exhibit 1, page 84.)

Finally, she said that her race was a factor in her termination. (Exhibit 1, page 86.) She

felt that because she was "black" and asked "questions" she was let go. (Exhibit 1, page 86.) She admits that she was black on the two occasions she was hired and when she was promoted. (Exhibit 1, pages 86-87.) As to the "questions" she asked, well, she cannot remember what these were. (Exhibit 1, page 87-88.)

## IV.    PLAINTIFF'S RETALIATION CLAIM

In plaintiff's amended complaint she also alleges that she was terminated because of ". . . her engagement in protected labor activity" (par. 16.)  However, while this statement appears in the factual narrative of plaintiff's complaint it is not referenced in the "claims" section of her complaint nor does it appear in the prayer for relief (par's 18-22).  In addition plaintiff cites no statutory basis for this claim.[13]  As a result it is not clear if this is a claim plaintiff wishes to assert and if so under what statutory basis.

In plaintiff's deposition the following colloquy took place:

> Q.    Ma'am in the litigation, you also allege that you thought you might have been fired or terminated for engaging in a protected activity.
>             . . .
> Can you recall any other reasons that you were let go now that had to do with any activities that you were engaged in or at least that you believe were reasons that you were let go?

---

[13]    The only jurisdictional basis cited by plaintiff are 28 USC 1331; 2201, 2002; 42 USC 2000 (par. 1).  None of these relate to protected labor activity unless plaintiff is seeking to set out a retaliation claim under Title VII.  If that is her intent she failed to assert such a claim in her EEOC charge and cannot, therefore, raise it now.

A.      I can't recall.  (Exhibit 1, page 96.)

Similarly, when asked about witnesses who were identified in her interrogatory answers concerning her protected activity claim plaintiff could not provide any information about what they allegedly knew about the claim.  (Exhibit 1, page 98.)

In a more general sense plaintiff testified that she got along well with all her co-workers and supervisors.  (Exhibit 1, pages 68-71.)  She never complained at anytime to STARC about how she was treated by anyone.  (Exhibit 1, page 71.)

However, she did testify that she complained once about wages to Ms. Johnston in October 1999.  (Exhibit 1, pages 75-76.)  But she admits her pay increased from $5.36 hr to $7.02 hr. during the second time she was employed by defendant.  (Exhibit 1, pages 76-77.)

In general there are two possible federal statutory claims of engaging in a "protected labor activity."  The first is under the National Labor Relations Act; 29 USC 158(a)(4) and the second under the Fair Labor Standards Act; 29 USC 215(a)(3).  Plaintiff has provided no testimony and identified no witnesses that would support such a claim.  As a result her protected activity claim should be dismissed.

## V.      PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

In White v. Monsanto, 585 So.2d 1205 (La. 1991) the court recognized the possibility that the tort of intentional infliction of emotional distress could apply to a workplace setting.  The court in White, supra, found, however, that no intentional infliction of emotional distress had

24

occurred.

In <u>White,</u> <u>supra,</u> the plaintiff sued her supervisor and employer as the result of verbal abuse she suffered from her supervisor.  In particular plaintiff's supervisor was alleged to have called her and her co-workers "motherfuckers"; accused them of sitting on their "fucking asses" and threatened to "show them the gate".

As a result of this outburst plaintiff became upset, had difficulty breathing and was hospitalized for three days with acute anxiety.  In reversing the decision in plaintiff's favor the court wrote as follows:

> When an employee seeks to recover from his employer for an intentional tort, a court must apply the legal precepts of general tort law related to the particular intentional tort alleged in order to determine whether he has proven his cause of action and damages recoverable thereunder.
>
> . . .
>
> Drawing on the background described, including consideration of Article 2315 and duty-risk principles, we affirm the viability in Louisiana of a cause of action for intentional infliction of emotional distress, generally in accord with the legal precepts set forth in the Restatement text and comments.
>
> One who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, such bodily harm. Thus, in order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

25

The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.[14]

Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

. . .

The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, and power to affect his interests. (cite omitted). Thus, many of the cases have involved circumstances arising in the workplace. (cites omitted).

A plaintiff's status as an employee may entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger.

On the other hand conduct which may be otherwise extreme and outrageous, may be privileged under the circumstances. Liability does not attach where the actor has done no more than insist upon his legal rights in a permissible way, even though he is aware that such instance is certain to cause emotional stress. (cite omitted). Thus, disciplinary action and conflict in a pressure packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable. Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving

---

[14]    In Deus v. Allstate Insurance Company, 800 F.Supp. 420 (W.D. La. 1992) the court, citing White v. Monsanto, infra, noted that an insurance salesperson's claim that he was spoken to rudely, given inadequate clerical staff, given inadequate telephone answering staff, was not allowed to advertise and had his phone number omitted from the local phonebook, did not, even taken together, rise to the level of an intentional infliction of emotional distress.

26

a pattern of deliberate, repeated harassment over a period of time.

. . .

The distress must be such that no reasonable person could be expected to endure it. Liability arises only where the mental suffering or anguish is extreme.

The defendant's knowledge that plaintiff is particularly susceptible to emotional distress is a factor to be considered. But the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.

. . .

Liability can arise only where the actor desires to inflict severe emotional distress or where he knows that such distress is certain or substantially certain to result from his conduct. (cite omitted). The conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry or the like. White, supra, pages 1208-1210.

More recently in Nicholas v. Allstate Insurance Company, 765 So.2d 1017 (La. 2000) the court revisited the issue of intentional infliction of emotional distress in the workplace. The court reaffirmed all of the principles set forth in White, supra. It also did a survey of national jurisprudence on this issue and wrote:

A canvass of national jurisprudence shows that courts require truly outrageous conduct before allowing a claim for intentional infliction of emotional distress even to be presented to a jury. Conduct which is merely tortious or illegal does not rise to the level of being extreme and outrageous. (page 1024-1025).

The court then wrote as follows:

27

> Although recognizing a cause of action for intentional infliction of
> emotional distress in a workplace setting, this state's jurisprudence
> has limited the cause of action to cases which involve a pattern of
> deliberate, recreated harassment over a period of time. (Cites
> omitted.)  The distress suffered by the employee must be more
> than a reasonable person could be expected to endure.  Moreover,
> the employer's conduct must be intended or calculated to cause
> severe emotional distress, not just some lesser degree of fright,
> humiliation, embarrassment or worry. (p. 1026-1027.)

Under this standard a wrongful demotion and transfer was insufficient to state a claim, Smith v.

Ouachita Parish Sch. Bd., 702 So.2d 727 (La. App. 2nd Cir. 1997); two years of questioning

plaintiff's workload, personal life and pressuring plaintiff to accept a demotion which resulted in

a termination was insufficient Stewart v. Parish of Jefferson, 668 So.2d 1292 (La. App. 5th Cir.

1996); a supervisor's 8 month tirade in which he shouted at plaintiff, cursed her, called her

derogatory names and accused her of making mistakes was insufficient, Beaudoin v. Hartford

Acc. & Indem. Co., 594 So.2d 1049 (La. App. 3rd Cir. 1992); supervisor's involvement with

ridiculing, taunting and teasing plaintiff during 7 ½ hours of questioning by security was

insufficient, Trahan v. Bell South Tel. Inc., 881 F.Supp 1080 (W.D. La. 1995); and calling upon

an employee to perform additional work tasks and using a special review procedure was

insufficient, Deus v. Allstate Ins. Co., 15 F.3d 506 (5th Cir. 1994).

In the present case plaintiff was asked what facts she had to prove intentional infliction

of emotional distress.  She said she was not aware of any facts supporting her claim. (Exhibit 1,

page 99.)  As a result her intentional infliction of emotional distress claim should be dismissed.

28

## VI.   SANCTIONS AGAINST PLAINTIFF

La. R.S. 23:333(B) provides that:

> Any plaintiff found by the judge to have brought a frivolous claim
> under this Part shall be held responsible for reasonable damages
> incurred as a result of the claim, reasonable attorney fees, and
> court costs. (Emphasis added.)

See Melendreras v. Blanchard, 598 So.2d 1226 (La. App. 4th Cir. 1992).  In the present case

plaintiff's race discrimination claim was asserted under both Title VII, 42 USC 2000e and La.

R.S. 23:332.  A review of the record reflects that plaintiffs' claim is totally without merit and is

frivolous.  Defendant asserted, as its Sixth Defense, that plaintiff's claims were frivolous and

requested attorneys fees and costs.  Defendant then asked plaintiff, through her counsel, to dismiss

this matter.  Plaintiff refused.[15]  Defendant requests a finding that this matter is frivolous and

pursuant to La. R.S. 23:333(B) and/or Rule 11 an award of costs/fees against Connie Catchings.

### CONCLUSION

For the reasons assigned defendant's Motion for Summary Judgment should be granted

and sanctions should be imposed on plaintiff for brining this action.

---

[15]    Plaintiff also had a lawsuit filed on behalf of her daughter against STARC which
is without merit.

29

**LEBLANC, TUSA & BUTLER, LLC**

_____

MICHAEL T. TUSA, JR., #02154
2121 Airline Drive
Suite 405
Metairie, Louisiana 70001
(504) 828-1010 (phone)
(504) 828-1079 (fax)
Attorney for St. Tammany Association for
Retarded Citizens

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been forwarded to all counsel of record

via U.S. Mail, postage pre-paid and properly addressed, this 2nd day of _August_, 2002.

_____

MICHAEL T. TUSA, JR.

30

## EXHIBIT LIST

1.     Connie Catchings' deposition

2.     Pre-employment criminal check

3.     Plaintiff's written explanation

4.     Sherri Johnston deposition

5.     Job description

6.     Affidavit of Elenora Crawford

7.     Affidavit of Dianne Baham

8.     EEOC Charge

9.     EEOC Determination Letter

10.    Notice of outstanding warrants

11.    October 30, 1998 memo

12.    October 16, 1997 warning

13.    December 16, 1999 warning

14.    June 22, 2000 warning

15.    June 28, 2000 warning

16.    Second June 28, 2000 warning

17.    June 30, 2000 memo

18.    September 26, 2000 memo

19.    September 25, 2000 evaluation

20.     January 19, 2001 memo

21.     Minutes of Quality Assurance meeting

22.     February 7, 2001 warning notice

23.     January 12, 2000 warning

24.     Plaintiff's interrogatory answers

25.     Takenya Collins warning notice

26.     Michelle Cryer separation notice

27.     Takenya Collins separation notice

28.     Connie Catchings separation notice

29.     July 26, 2001 Order

30.     September 1999 warning

31.     October 1999 warning

32.     July 5, 2000 memo

33.     January 2002 order

S:\mrusa\2862-005 (01-2111)\PLEADINGS\MOTION FOR SUMMARY JUDGMENT.wpd

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED